UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

    -v.-

DALE CHAPPELL,

        Defendant.

Case No. 24-cr-243 (KMW)

**MEMORANDUM OF LAW IN SUPPORT OF
DALE CHAPPELL'S PRETRIAL MOTIONS**

Dated: March 27, 2026
New York, New York

MORVILLO ABRAMOWITZ
GRAND IASON & ANELLO P.C.

565 Fifth Avenue
New York, New York 10017
(212) 856-9600

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT.................................................................................................. 1

I.     The Court Should Order the Government to Disclose the Grand Jury Minutes................. 1

       A.     Factual Background ................................................................................................ 2

              1.     Mr. Chappell Had Preexisting Plans to Trade............................................ 2

              2.     Mr. Chappell Acted in Good Faith.............................................................. 6

              3.     The Prosecutors Misled the Grand Jury About the Facts.......................... 11

              4.     The Prosecutors Likely Misled the Grand Jury About the Law................ 13

       B.     Applicable Law..................................................................................................... 16

              1.     The Government Must Prove "Use" of MNPI............................................ 16

              2.     Intent to Defraud is Negated by Good Faith............................................. 19

              3.     Incorrect or Misleading Legal Instructions Require Dismissal ................ 20

              4.     Courts Regularly Inspect Grand Jury Minutes......................................... 21

       C.     Discussion ............................................................................................................ 22

              1.     Disclosure is Needed to Avoid a Possible Injustice ................................. 22

              2.     The Need For Disclosure Is Greater Than the Need for Secrecy.............. 26

              3.     The Request is Appropriately Limited...................................................... 27

II.    The Court Should Order the Government to Provide a Bill of Particulars....................... 28

       A.     Applicable Law..................................................................................................... 28

       B.     Discussion ............................................................................................................ 30

              1.     Neither the Indictment Nor Discovery Specify the MNPI At Issue.......... 30

              2.     A Bill of Particulars is Necessary to Prevent Unfair Surprise ................. 32

III.    Counts Three, Four, and Five Are Multiplicitous and the Court Should Dismiss or Consolidate Them ..................................................................................................... 35

    A.    Applicable Law ............................................................................................... 35

    B.    Discussion ....................................................................................................... 36

CONCLUSION .............................................................................................................................. 39

## TABLE OF AUTHORITIES

**CASES**                                                                                  **PAGE(S)**

*Bank of Nova Scotia v. United States*,
  487 U.S. 250 ..................................................................................................... 21

*Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) .......................................................................................... 17

*Douglas Oil Co. of Cal. v. Petrol Stops Nw.*,
  441 U.S. 211 (1979)...................................................................................... 22, 26

*Howard v. SEC*,
  376 F.3d 1136 (D.C. Cir. 2004) ....................................................................... 20

*Loper Bright Enter. v. Raimondo*,
  603 U.S. 369 (2024) .......................................................................................... 17

*Salman v. United States*,
  580 U.S. 39 (2016) ............................................................................................ 17

*SEC v. Adler*,
  137 F.3d 1325 (11th Cir. 1998)..................................................................... 16, 17

*SEC v. Chappell*,
  107 F.4th 114 (3d Cir. 2024)......................................................................... 32, 33

*SEC v. Westport Capital Markets, LLC*,
  613 F. Supp. 3d 643 (D. Conn. 2020)........................................................... 19, 20

*Smith v. O'Grady*,
  312 U.S. 329 (1941) .......................................................................................... 28

*Staples v. United States*,
  511 U.S. 600 (1994)........................................................................................... 17

*United States v. Addonizio*,
  451 F.2d 49 (3d Cir. 1971)................................................................................ 29

*United States v. Anderson*,
  533 F.3d 623 (8th Cir. 2008).............................................................................. 16

*United States v. Belton*,
  2015 WL 1815273 (N.D. Cal. Apr. 21, 2015) ................................................... 27

iii

*United States v. Bin Laden*,
  92 F. Supp. 2d 225 (S.D.N.Y. 2000) ........................................................................... 31

*United States v. Blakstad*,
  19-CR-486 (ER) (S.D.N.Y.) ........................................................................................ 18

*United States v. Bowling*,
  108 F. Supp. 3d 343 (E.D.N.C. 2015) ......................................................................... 21

*United States v. Bravo-Fernandez*,
  239 F. Supp. 3d 411 (D. P.R. 2017) ...................................................................... 22, 27

*United States v. Calandra*,
  414 U.S. 338 (1974) ..................................................................................................... 20

*United States v. Ceneus*,
  2011 WL 5547107 (N.D. Fl. 2011).......................................................................... 22, 27

*United States v. Cerullo*,
  2007 WL 2462111 (S.D. Cal. Aug. 28, 2007) ............................................................ 21

*United States v. Chacko*,
  169 F.3d 140 (2d Cir. 1999)..................................................................................... 35, 38

*United States v. Comey*,
  809 F. Supp. 3d 396 (E.D. Va. 2025) .......................................................................... 27

*United States v. Contorinis*,
  2010 U.S. Dist. LEXIS 74739 (S.D.N.Y. May 5, 2010).......................................... 29, 37

*United States v. D'Alessio*,
  822 F. Supp. 1134 (D.N.J. 1993) ......................................................................... 21, 23, 24

*United States v. DePaoli*,
  41 F. App'x 543 (3d Cir. 2002)..................................................................................... 29

*United States v. Facteau*,
  2016 WL 4445741 (D. Mass. 2016) ............................................................................. 26

*United States v. Falbo*,
  1993 WL 147441 (S.D.N.Y. Apr. 6, 1993) ................................................................. 29

*United States v. FedEx Corp.*,
  2016 U.S. Dist. LEXIS 6155 (N.D. Cal. Jan. 19, 2016)........................................ passim

iv

*United States v. Greenspan*,
  923 F.3d 138 (3d Cir. 2019).................................................................................... 19

*United States v. Haddy*,
  134 F.3d 542 (3d Cir. 1998)........................................................................... 36, 37, 38

*United States v. Harra*,
  985 F.3d 196 (3d Cir. 2021).................................................................................... 19

*United States v. Heron*,
  323 F. App'x 150 (3d Cir. 2009)............................................................................. 19

*United States v. Heron*,
  525 F. Supp. 2d 729 (E.D. Pa. 2007) ...................................................................... 18

*United States v. Ho*,
  2009 WL 2591345 (D. Haw. 2009) .................................................................... 22, 28

*United States v. Horner*,
  853 F.3d 1201 (11th Cir. 2017).............................................................................. 20

*United States v. Lacerda*,
  2013 WL 3146835 (D.N.J. June 19, 2013)............................................................. 31

*United States v. Langford*,
  946 F.2d 798 (11th Cir. 1991).................................................................. 35, 36, 37, 38

*United States v. Lavidas*,
  19-CR-716 (DLC) (S.D.N.Y.) .............................................................................. 18

*United States v. Ligambi*,
  No. 09-00496-01, 2012 WL 2362638 (E.D. Pa. June 21, 2012) ............................... 30

*United States v. Lopez-Lopez*,
  282 F.3d 1 (1st Cir. 2002) .................................................................................... 20

*United States v. Martinez*,
  800 F.3d 1293 (11th Cir. 2015).............................................................................. 20

*United States v. Nacchio*,
  2006 WL 2475282 (D. Colo. Aug. 25, 2006) ..................................................... 30, 31

*United States v. O'Hagan*,
  521 U.S. 642 (1997) ............................................................................................ 16

v

*United States v. Parker*,
   776 F. App'x 756 (3d Cir. 2019)..................................................................... 19

*United States v. Peizer*,
   No. 23-CR-89 (DSF) (C.D. Cal.)................................................................... 15

*United States v. Peralta*,
   763 F. Supp. 14 (S.D.N.Y. 1991) .................................................................. 21

*United States v. Pirro*,
   212 F.3d 86 (2d Cir. 2000)............................................................................ 21

*United States v. Rajaratnam*,
   13-CR-211 (NRB) (S.D.N.Y.) ..................................................................... 18

*United States v. Rajaratnam*,
   2010 WL 2788168 (S.D.N.Y. July 13, 2010) ........................................ 29, 34

*United States v. Roque*,
   2013 WL 2474686 (D.N.J. June 6, 2013)............................................... 28, 29

*United States v. Rosa*,
   891 F.2d 1063 (3d Cir. 1989)........................................................................ 29

*United States v. Royer*,
   549 F.3d 886 (2d Cir. 2008)..................................................................... 17, 18

*United States v. Sandstrom*,
   594 F.3d 634 (8th Cir. 2010)......................................................................... 35

*United States v. Scully*,
   877 F.3d 464 (2d Cir. 2017).......................................................................... 19

*United States v. Sells Engineering, Inc.*,
   463 U.S. 418 (1983) ...................................................................................... 20

*United States v. Singhal*,
   876 F. Supp. 2d 82 (D.D.C. 2012)................................................................. 13

*United States v. Smith*,
   155 F.3d 1051 (9th Cir. 1998)................................................................. passim

*United States v. Stevens*,
   771 F. Supp. 2d 556 (D. Md. 2011) ................................................... 21, 24, 27

*United States v. Teicher*,
   987 F.2d 112 (2d Cir. 1993) ................................................................. 17, 18

*United States v. Twersky*,
   1994 WL 319367 (S.D.N.Y. June 29, 1994). ............................................ 20, 22, 26

*United States v. Urban*,
   404 F.3d 754 (3d Cir. 2005) ................................................................. 28

*United States v. Whitman*,
   555 F. App'x 98 (2d Cir. 2014) ............................................................. 18

*United States v. Williams*,
   504 U.S. 36 (1992) ........................................................................... 12

*Whitman v. United States*,
   574 U.S. 1003 (2014) ........................................................................ 17

**Statutes & Constitutional Provisions**

15 U.S.C. § 78j(b) ............................................................................... 34, 36

15 U.S.C. § 78ff .................................................................................. 34, 36

U.S. Const. amend. VI .......................................................................... 29

**Rules**

Fed. R. Crim. P. 6(e)(3)(E)(ii) .............................................................. 21

Fed. R. Crim. P. 7(f) ........................................................................... 29

**Regulations**

17 C.F.R. § 240.10b-5 ......................................................................... 35

**Other Authorities**

*In re Investors Management Company, Inc.*,
   Fed. Sec. L. Rep. (CCH) ¶ 78,163, at 80,514 (SEC Ruling July 29, 1971) ............................. 13

Kenneth P. Vogel & Susanne Craig, *Trump Administration Updates: Government Delays Forced Collections of Student Loans*, N.Y. Times https://www.nytimes.com/live/2026/01/16/us/trump-news ........................................................ 15

*U.S. Department of Justice Manual*, 9-11.233 ............................................................... 12

*United States v. Heron*, Government's Brief, 2008 WL 5551064 ............................................................................................................ 18

**PRELIMINARY STATEMENT**

Dale Chappell has been wrongfully charged with insider trading.  He seeks three forms of relief here.

*First*, there is compelling evidence that the prosecutors procured the Indictment by misleading the grand jury as to two critical legal issues:  the defendant's alleged "use" of material non-public information, and the defendant's alleged intent to defraud.  The Court should order disclosure or *in camera* inspection of the grand jury minutes and, ultimately, should dismiss the Indictment.

*Second*, the Indictment fails to specify the alleged material non-public information that Mr. Chappell allegedly used in his trading, depriving Mr. Chappell of fair notice and ability to prepare his defense.  The Court should order the government to provide a bill of particulars specifying this information.

*Third*, Counts Three, Four and Five of the Indictment are multiplicitous.  They should be consolidated or dismissed.

**I.      The Court Should Order the Government to Disclose the Grand Jury Minutes**

The Indictment alleges that Mr. Chappell sold some of his Humanigen stock after receiving material non-public information ("MNPI").  But there is overwhelming evidence that (1) Mr. Chappell had clear plans to sell this stock that pre-date his receipt of alleged MNPI; and (2) Mr. Chappell acted in good faith by making the sales only after consulting with his company's chief compliance officer, board of directors and outside securities counsel and receiving all relevant approvals.  Further, the Indictment makes specific reference to an erroneous legal standard, and there are numerous other reasons to believe that the prosecutors gave the grand jury inaccurate or misleading instructions that reduced the government's burden

on the two key issues of use of MNPI and intent to defraud, and therefore prejudiced the grand jury's deliberations. The Court should order disclosure or *in camera* inspection of the grand jury minutes to ensure that the grand jury was not misled. If it was, the Court should dismiss the Indictment.

### A.    Factual Background

#### 1.    Mr. Chappell Had Preexisting Plans to Trade

Mr. Chappell is an experienced biotechnology investor, with degrees in both medicine and business. Since 2002, he operated two investment funds, primarily invested in stocks of biotechnology companies, and managed his own investments in a third fund (collectively, the "Black Horse Funds" or "Funds"). In 2016, Mr. Chappell and his Funds helped rescue from bankruptcy a company that came to be called Humanigen. Having provided the financing that enabled the company to emerge from bankruptcy, the Black Horse Funds became Humanigen's largest shareholders, and Humanigen became the Funds' largest investment by far. Mr. Chappell also served on Humanigen's board of directors starting in February of 2021 and, starting in July of 2020, acted as the company's Chief Scientific Officer—facts that were disclosed to Humanigen shareholders and the Funds' investors.

Prior to the COVID-19 pandemic, Humanigen was developing a drug called lenzilumab ("Lenz") to treat the harmful inflammation, known as "cytokine storm," associated with certain cancer therapies. When the pandemic hit in 2020, scientific evidence indicated that cytokine storm was the cause of severe illness in patients with COVID-19. Humanigen thus began studying Lenz as a therapeutic treatment for COVID-19, launching in May 2020 a randomized, double-blind, placebo-controlled study that concluded in March 2021. In March 2020, Humanigen had submitted a protocol synopsis to the Food and Drug Administration ("FDA")

2

and began a dialogue with the FDA about the design and protocol of the study and its likely intent to apply for Emergency Use Authorization ("EUA") at the conclusion of its study.  Also in 2020, the National Institutes of Health ("NIH") selected Lenz to be included in a study of promising COVID-19 treatments, and in May 2021, the NIH, encouraged by Humanigen's trial data, expanded that study to serve as a larger, confirmatory trial.

Humanigen launched an initial public offering on NASDAQ on September 8, 2020. Because of their years of financial support for the company, in May 2021 the Black Horse Funds owned approximately 14 million shares of Humanigen.  McKay Decl., ¶ 3, Ex. 1 at 1, 3, 5.[1]  By December 2020, these shares were trading as high as $21 per share—up about ten-fold from their price at the outset of the pandemic—meaning that Mr. Chappell and his Funds held well over $290 million worth of Humanigen stock.  McKay Decl., ¶ 4, Ex. 2.

The appreciation of that stock meant both that Mr. Chappell and his investors had enormous, unrealized gains, and that the Funds were 98 – 100% composed of Humanigen stock, a potentially dangerous concentration.  McKay Decl., ¶ 5, Ex. 3 at 27.  Yet, because of post-IPO lockups and blackout periods for insiders, Mr. Chappell had no ability to sell any of the Funds' shares between June 2020 and March 2021 during the period of significant stock price appreciation.  McKay Decl., ¶¶ 6-8, Exs. 4, 5, 6.

Anticipating that trading windows would finally open and the lock up agreements would expire in spring 2021, Mr. Chappell made specific plans to diversify his Funds' holdings and

---

[1] "McKay Decl." refers to the declaration of Thomas A. McKay filed in support of this motion. Consistent with the Protective Order governing discovery in this case (Dkt. 20), the exhibits to that declaration that were produced by the government have been filed under seal and, accordingly, the identities of certain witnesses have been anonymized in this filing.  Mr. Chappell has contemporaneously filed a motion seeking leave to file under seal a few additional exhibits produced by the defense in discovery.

realize some profit and liquidity by selling 25% of their Humanigen stock once he was permitted to do so.  Critically, these plans *pre-date* the FDA's April and May 2021 feedback that is the only plausible MNPI that Mr. Chappell might have received.[2]

Mr. Chappell's preparation began at least by December 10, 2020, when he emailed his broker to move the Funds' Humanigen shares to a brokerage account,[3] indicating that the shares were "coming off of lock-up," and when asked his plans for the stock, stating that he would be "putting together a trading plan for 2021 to get some liquidity from these shares."  McKay Decl., ¶ 9, Ex. 7.

Days later, on December 19, 2020, Mr. Chappell had a phone call with an investor in one of his Funds (the "Investor").  McKay Decl., ¶¶ 10-11, Exs. 8, 9.  The Investor's contemporaneous notes of that call indicate that Mr. Chappell stated his intent to get "liquidity" and specifically indicated that he would be selling at least 25% of the Funds' Humanigen stock.  McKay Decl., ¶ 12, Ex. 10 at 3 (indicating that after the sales, "HGEN" would comprise "75%" to "60%" of the "portfolio," meaning that he would be selling 25 to 40%).

On the same day as the investor conversation above, Mr. Chappell consulted with Humanigen's outside securities counsel and compliance department about his plans to sell.  Several days later, he obtained a letter confirming his compliance with relevant SEC rules and enabling him to transfer the shares into a tradable brokerage account.  McKay Decl., ¶ 13, Ex. 11 at 8.  Throughout January 2021, Mr. Chappell followed up with brokers to confirm that the shares had been converted into tradable form.  *See, e.g.*, McKay Decl., ¶ 14, Ex. 12.

---

[2] As noted in Section II, *infra*, the Indictment may be alleging that Mr. Chappell received another piece of alleged MNPI in January 2021.  Ind. ¶ 5(a).  That allegation would be frivolous as discussed below, and in any event, Mr. Chappell's plans to trade pre-date January 2021.

[3] Prior to December 2020, the shares were held in non-tradable book-entry format.

On February 12, 2021, Mr. Chappell spoke with another one of his investors, Marios Kalochoritis. Mr. Kalochoritis shared Mr. Chappell's concerns about the Funds' concentration in Humanigen stock, and understood from the call that Mr. Chappell "planned to sell a significant amount of Humanigen stock . . . when he had an opportunity to do so." McKay Decl., ¶ 15, Ex. 13, ¶ 5. On March 13, 2021, Mr. Chappell spoke again to the Investor he had spoken with in December, and, as reflected in the Investor's contemporaneous notes, reiterated his plan to obtain "liquidity." McKay Decl., ¶ 12 Ex. 10 at 1. The Investor informed prosecutors that when Mr. Chappell later sold 25% of the Funds' Humanigen stock, "[he] saw [Mr. Chappell] as doing the prudent thing in diversifying a portion of the fund outside of HGEN. [He] did not see anything inappropriate in [Mr. Chappell's] behavior or statements that gave him concern." McKay Decl., ¶ 16, Ex. 14 at 5.

The first trading window since Humanigen's IPO opened on March 12, 2021 and closed three days later. This trading window occurred prior to Humanigen announcing the results from its study of Lenz. Expecting positive results from the study, but not knowing how the stock would trade following the release of the study results, Mr. Chappell executed trading plans for a portion of the amount he planned to sell and had communicated to his investors. The trading plans would have resulted in the sale of roughly 9% of his Funds' holdings in Humanigen if the price triggers had been met (which they ultimately were not, such that no sales were made at that time). As Mr. Chappell told a broker on March 16, "We are only selling up to 9% of our HGEN stock with the current 10b-5 plan *so there is a lot more to come*." McKay Decl., ¶ 17, Ex. 15 (emphasis added).[4] Mr. Chappell specified that he intended for those additional sales to come

_____

[4] A "10b-5 plan" is a written agreement between a corporate insider and a broker that establishes predetermined trading instructions for company stock. Such plans are executed during an open

during "the next open window which should be in May" after the stock had reflected the results of the study. *Id.*

Ultimately, the next trading window for Humanigen insiders did not open until June 2021. Mr. Chappell then did exactly what he had previously planned and had communicated with his investors, by selling approximately 25% of his Funds' shares of Humanigen.

### 2. Mr. Chappell Acted in Good Faith

On March 26, 2021, Humanigen received preliminary topline data from its study and, on March 29, 2021, publicly announced the results and shared the data with the FDA. The FDA provided preliminary feedback on that data in written comments dated April 12, during a meeting with Humanigen on April 14, and in minutes memorializing that meeting which were sent to Humanigen on May 13.

As discussed in Section II, *infra*, the Indictment seems to allege—though it does not specify—that this April and May 2021 feedback constituted MNPI. *See, e.g.*, Ind. ¶ 5(d), (e), (h). While Mr. Chappell disagrees that this information was in fact MNPI, the Court may still assume that to be the case for purposes of this motion because there is overwhelming evidence that Mr. Chappell believed in good faith that the feedback was *not* MNPI and that Mr. Chappell was acting lawfully when he carried out his pre-existing plan to sell 25% of his Funds' Humanigen stock.

Specifically, notwithstanding the Indictment's characterization of the FDA's feedback, the prosecutors were informed by numerous Humanigen employees and others, all of whom were present for the key FDA meeting and/or were briefed in detail on the feedback, that they

---

trading window, and typically set forth the number of shares to be bought or sold and the prices and time periods for such transactions.

remained optimistic about Humanigen's chances of receiving EUA approval.  For example:

- Humanigen's CEO (the "CEO") said that his interactions with the FDA "led [him] to believe that LENZ would ultimately receive approval."  McKay Decl., ¶ 18, Ex. 16 at 9-10.

- A Humanigen scientist said that, from his perspective, "the data would carry the day for LENZ.  [He] was cautiously optimistic that EUA would be approved."  McKay Decl., ¶ 19, Ex. 17 at 10.

- One board member said:  "Everyone at HGEN was very optimistic about the prospects of gaining approval to use LENZ against COVID-19."  McKay Decl., ¶ 20, Ex. 18 at 1.

- Another board member said:  "Everybody who was involved in the studies and discussions was optimistic."  McKay Decl., ¶ 21, Ex. 19 at 2.

- Humanigen's Chief Financial Officer and Chief Compliance Officer (the "Compliance Officer") interpreted the FDA's feedback as saying that the FDA "would approve the product ahead-of-time, while other information came in."  McKay Decl., ¶ 22, Ex. 20 at 8.

Furthermore, Mr. Chappell and his colleagues repeatedly consulted with and relied on appropriate professionals regarding the legal significance of the FDA's feedback.  Specifically, on April 20, 2021, Humanigen's board of directors met and discussed, among other things, the FDA's feedback.  Present at that meeting were:

- The Compliance Officer, who had substantial experience in the industry and had been present for the April 14 FDA meeting;

- The company's outside securities counsel (the "Outside Counsel"), a partner at prominent law firm whose practice focuses on securities disclosures; and

- The company's entire board of directors, which included experienced biopharmaceutical professionals and a retired federal judge.

During the board meeting, the CEO gave a detailed, candid briefing on the FDA feedback. McKay Decl., ¶ 23, Ex. 21 at 3 (describing current data as "unlikely sufficient for EUA approval").  Afterwards, the attendants discussed whether public disclosures about the FDA feedback were required, and "[t]he Board was of the opinion that the company should ***not***

7

disclose the meeting details given the incomplete nature of the data." McKay Decl., ¶ 24, Ex. 22 at 1 (emphasis added).

Weeks later, on May 13, 2021, Humanigen issued a quarterly public filing, which was prepared with extensive discussion involving Outside Counsel, the Compliance Officer, and members of the board's disclosure and audit committees. McKay Decl., ¶ 25, Ex. 23 at 5-6. Again, it was the considered view of that group that it was sufficient for the public filing to reference the FDA meeting and warn that there was no assurance that the existing data would be sufficient for an EUA. *Id.*

On May 28, 2021, the Compliance Officer announced that the trading window for company insiders would open on June 2. McKay Decl., ¶ 26, Ex. 24. The Compliance Officer's decision to do so necessarily reflected that, notwithstanding his attendance at the FDA meeting, he did not believe that insiders had MNPI—as he later told prosecutors. McKay Decl., ¶ 22, Ex. 20 at 14 (Compliance Officer stating that, before he opened the window, he would discuss whether there was any MNPI with the CEO and counsel, among others). The CEO similarly told prosecutors that he confirmed that the Compliance Officer had spoken with Outside Counsel to confirm that there was no MNPI that would preclude the opening of the trading window. McKay Decl., ¶ 18, Ex. 16 at 5.

On June 2, 2021, Mr. Chappell instructed his broker to sell 475,000 shares of Humanigen stock during the window and indicated his intent to sell even more shares subsequently pursuant to 10b5-1 plans. McKay Decl., ¶ 27, Ex. 25. Mr. Chappell received approval from Humanigen's compliance department for these sales. McKay Decl., ¶ 28, Ex. 26. Pursuant to these instructions, 475,000 shares of Humanigen were sold by the Black Horse Funds in early June.

8

On June 10, 2021, Mr. Chappell sent an email to the CEO, the Compliance Officer, and the Outside Counsel, describing his plan to reduce his Funds' exposure to Humanigen "by about 25%." McKay Decl., ¶ 27, Ex. 27. In order to maintain ownership and "capture[] more upside of the stock," Mr. Chappell sought to make a hedging transaction called a "no-cost collar," which would enable him to maintain his current stock ownership, capturing the upside of a positive EUA decision while reducing portfolio risk by 25% as he had previously planned and communicated to his investors dating back to December 2020. *Id.*[5] That transaction required a waiver from Humanigen's board of directors, however, so on June 12 and 13, 2021, the board assembled to discuss Mr. Chappell's proposed transaction, along with the Outside Counsel and the Compliance Officer. McKay Decl., ¶ 31, Ex. 29. The minutes describe Mr. Chappell's stated goal to reduce his Funds' exposure to Humanigen by "about 25%" while "retain[ing] its beneficial ownership of all such shares" and his alternative plan to "sell 25% of the shares." *Id*.

As the CEO has told prosecutors, the board meeting included "discussion about the trading window being open, discussion about MNPI, and a discussion about the trades being compliant with the insider trading policy." McKay Decl., ¶ 18, Ex. 16 at 7. As one board member summarized it to prosecutors, "[t]he questions were: was it legal and can he sell ***both of which were yes***." McKay Decl., ¶ 32, Ex. 30 at 8 (emphasis added). The board thus issued a resolution authorizing Mr. Chappell's trades, which was signed by the CEO and approved by Outside Counsel who had been present for the board discussion, was the secretary of the meeting, and was well versed in the FDA dialogue. McKay Decl., ¶ 33, Ex. 31.

---

[5] Specifically, Mr. Chappell would have sold call options at $30 per share and bought put options at $17 per share, such that if the FDA granted an EUA, the Black Horse Funds would be able to capture 50% more upside from the current price of $20 (by exposure to the $30 call). Mr. Chappell and his investors would have reduced risk by 25% as previously planned and communicated (by exposure to the $17 put). McKay Decl., ¶ 30, Ex. 28.

9

Ultimately, the no-cost collar transaction could not be executed at the proposed prices. McKay Decl., ¶¶ 34-36, Exs. 32, 33, 34. Thus, Mr. Chappell carried out the alternative plan that had been discussed at the board meeting, selling 25% of the Funds' shares in the open market. On June 15, 2021, he executed Rule 10b5-1 trading plans on behalf of the Black Horse Funds, which called for the sale of 3,360,000 shares—25% of the Funds' current holdings. McKay Decl., ¶ 37, Ex. 35 at 9, 20, 31. The plans were approved in writing by both the Compliance Officer and the CEO. McKay Decl., ¶¶ 38-39, Exs. 36, 37.

As the Compliance Officer told prosecutors, the board's approval for the (failed) no-cost collar transaction extended to Mr. Chappell's open market sales. McKay Decl., ¶ 40, Ex. 38 at 8 ("If . . . the collar did not work, he would still have had approval for sale of an amount of HGEN stock equivalent to the proportion of his holdings represented by the collar."). Or, as the CEO put it to prosecutors, "[Mr. Chappell's] trades of HGEN were fully vetted." McKay Decl., ¶ 18, Ex. 16 at 6.[6]

Once "fully vetted," the trades were executed by a broker in a series of sales on different dates over the course of the next two months. When the sales were complete, Humanigen represented 64%, 65% and 71% of the portfolio of the three Funds, respectively. McKay Decl., ¶¶ 42-44, Exs. 40, 41, 42. That is precisely what Mr. Chappell had told the Investor in December 2020—that when his plans were complete, Humanigen would represent between "60%" and "75%" of the Funds' portfolio. McKay Decl., ¶ 12, Ex. 10 at 3.

---

[6] Mr. Chappell was not alone in believing it was lawful to trade at this time. On June 14, the day before Mr. Chappell signed his trading plans, the CEO emailed Mr. Chappell and board members, indicating that he too would be selling some stock and that he had spoken with Outside Counsel to "ensure no securities issues." McKay Decl., ¶ 41, Ex. 39. As the CEO told prosecutors, he confirmed with Outside Counsel that there was no MNPI at the time of his sales. McKay Decl., ¶ 18, Ex. 16 at 5. In addition to the CEO, three other Humanigen insiders sold some stock around this time period; yet only Mr. Chappell has been charged.

10

### 3.    The Prosecutors Misled the Grand Jury About the Facts

The foregoing evidence was all known (or should have been known) to the prosecutors

when they presented this case to the grand jury.  Not only is this substantial exculpatory evidence

generally inconsistent with the Indictment's finding of probable cause, but there are also several

specific allegations in the Indictment that make clear that the prosecutors misled the grand jury

by selectively presenting certain information without disclosing directly contradictory and

exculpatory evidence.  For example:

- The Indictment alleges that Mr. Chappell "exercise[d] his influence within Humanigen to prevent the company from disclosing the FDA's negative message."  Ind. ¶ 5(g).  But the Compliance Officer, who was deeply involved in those decisions, expressly denied this to prosecutors: "The decision not to disclose the FDA meeting results was a consensus of the group. . . . *[Mr. Chappell's] advice was not weighed differently*."  McKay Decl., ¶ 22, Ex. 20 at 14 (emphasis added).

- The Indictment quotes an email from the Compliance Officer suggesting that the company's disclosure was not "sufficient."  Ind. ¶ 5(g).  But it fails to note that the Compliance Officer specifically told prosecutors that he "*changed his opinion about disclosing the information*" after that email, and that his change of opinion was based on "thoughtful discussions" with the board, executive team, and attorneys.  McKay Decl., ¶ 22, Ex. 20 at 12-13 (emphasis added).

- The Indictment alleges that Mr. Chappell misled Humanigen's board during the April 20 meeting by "knowingly omitting" that his proposed analysis of additional data "conflicted with FDA public guidance on subset analysis." Ind. ¶¶ 2(l), 5(f).  There are a host of problems with this assertion, including that the FDA guidance that Mr. Chappell supposedly concealed is *public information* that *does not apply* to an EUA application; Mr. Chappell had never seen this FDA guidance document prior to the Indictment; and Mr. Chappell's comments about subset analysis were directed at a totally different licensing application than the one at issue.[7]    But for present

---

[7] In brief, Mr. Chappell actually told the board how the subgroup data could support a separate, confirmatory study for full licensing or "BLA" approval—entirely different from EUA approval. McKay Decl., ¶ 24, Ex. 22 at 2 ("Dr. Chappell outlined a potential BLA-enabling study").  FDA Commissioner Janet Woodcock soon personally endorsed that exact position when the NIH expanded the "ACTIV-5" study of Lenz.  McKay Decl., ¶¶ 48-49, Ex. 46 at 2 (NIH describing Humanigen's subgroup data and agreeing it could serve "potentially BLA enabling trial"); Ex. 47

11

purposes, suffice it to state that ***none of the board members said they were misled*** when the government interviewed them and one board member specifically denied it.  McKay Decl., ¶ 20, Ex. 18 at 2 ("[The board member] ***did not think [Mr. Chappell] or [the CEO] mislead [sic] the board members as to what the FDA was saying***.") (emphasis added)).

These specific, documented contradictions between the Indictment's allegations and the exculpatory evidence in the prosecutors' possession raise serious concern that the grand jury was presented with a selective and misleading portion of the evidence.

These contradictions led the defense to inquire whether the prosecutors had complied with their obligation to disclose substantial exculpatory evidence to the grand jury.  *See U.S. Department of Justice Manual*, 9-11.233 ("[W]hen a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence that directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such a person.").[8]  In response, the prosecutors declined to state that they had complied with this ethical obligation, claiming that they could not do so in light of grand jury secrecy rules.

---

("Janet W . . . signed off. This is a huge win.")).  Humanigen later highlighted that endorsement when it submitted its EUA application.  McKay Decl., ¶ 50, Ex. 48 at 1.  Thus, when the Board (with the Compliance Officer and Outside Counsel present) unanimously approved Mr. Chappell's trades in June 2021, it did so with full knowledge not only of the FDA staff's preliminary feedback but also this FDA Commissioner-level endorsement, which contributed to Mr. Chappell's and Humanigen's reasonable belief that Lenz would receive EUA approval and to Mr. Chappell's good-faith reliance on the approval of his trades by the Compliance Officer and the board.  This information clearly was not presented to the grand jury.

[8] That policy exists notwithstanding the Supreme Court's holding that a prosecutor's failure to disclose exculpatory evidence to the grand jury does not warrant dismissal of an otherwise valid indictment.  *See United States v. Williams*, 504 U.S. 36 (1992).  The DOJ apparently seeks to hold its prosecutors to a higher standard, which was not met here.  *Williams* is not relevant to this motion, however, as the motion is based on the prosecutors' misleading legal instructions, not their misleading presentation of the evidence.  Evidence of the latter is merely presented as background to the former.

12

**4.        The Prosecutors Likely Misled the Grand Jury About the Law**

The above-described exculpatory evidence is directly relevant to two legal issues at the heart of this case: (1) the requirement that the government prove that the defendant "used" MNPI; and (2) the requirement that the government prove that the defendant acted with intent to defraud and not in good faith.  There is compelling evidence that the prosecutors misled the grand jury about these two legal requirements.

First, to prove insider trading, prosecutors must show that the defendant "used" material non-public information, not merely that he possessed it.  *See* Section I.B.1, *infra*.  The Indictment indicates that the prosecutors erroneously instructed the jury in this regard:  It specifically quotes a Humanigen policy manual, which states that "it does not matter that you may have decided to engage in a transaction before becoming aware of material non-public information or that the material non-public information did not affect your decision to engage in the transaction."  Ind. ¶ 2(e).  That may be Humanigen's company policy, but it is not the law. *See, e.g.*, *United States v. Smith*, 155 F.3d 1051, 1068 (9th Cir. 1998) ("an investor who has a preexisting plan to trade, and who carries through with that plan after coming into possession of [MNPI], does not intend to defraud"); *see also United States v. Singhal*, 876 F. Supp. 2d 82, 103 (D.D.C. 2012) (explaining that a company's policy cannot reduce the government's burden to prove insider trading).

Nowhere else does the Indictment clarify that, whatever the (irrelevant) company policy may say, the government must prove "use" of MNPI.  The Indictment merely invokes the phrase "on the basis of" MNPI, which, as explained below, is the vague language that the government sometimes argues encompasses its erroneous mere possession standard.  Ind. ¶¶ 5(u), 7.  Further, the Indictment repeatedly makes explicit reference to Mr. Chappell's possession or awareness—

13

but conspicuously not his *use*—of MNPI.  *See, e.g.*, Ind. ¶¶ 4 ("when he, but not the public, knew . . . "), 5(p) ("in possession of"), 5(q)(i) ("in possession of"), 5(q)(ii) ("falsely certified he did 'not know any . . .'"), 5(q)(iii) ("in possession of"), 5(q)(iv) ("falsely certified that he did 'not know any . . .'"), 5(q)(v) ("in possession of").  This refrain further focused the grand jury on the concepts of knowledge and possession, rather than use.  The Indictment therefore provides clear evidence that the grand jury was misled.

Furthermore, in applications for search warrants, the government repeatedly misstated the law, claiming that Mr. Chappell had engaged in insider trading "by selling millions of shares of Humanigen securities while ***possessing*** MNPI."  McKay Decl., ¶ 45, Ex. 43 at 24 (emphasis added); ¶ 5, Ex. 3 at 13 (same); *see also* McKay Decl., ¶ 46, Ex. 44 at 24 (describing offense as "Trading While in Possession of MNPI")).  These repeated misstatements of the law by the prosecutors and their FBI partners provide further indication that they instructed the grand jury using the erroneous "mere possession" standard.

*Second*, the charged crimes require an intent to defraud, which is negated by good faith reliance on the advice of professionals.  *See* Section I.B.2, *infra*.  Here, the Indictment makes generic references to a scheme to defraud but does not explicitly allege Mr. Chappell's culpable intent.  Ind. ¶¶ 3, 4, 7.  And while the Indictment twice references "good faith" in discussing Rule 10b5-1 plans (Ind. ¶¶ 2(d), 5(p)), it never alleges that Mr. Chappell did *not* act in good faith, and the Indictment is silent as to the relevance of professional advice to the issue of good faith.

Further, the Indictment is affirmatively misleading regarding the approvals of Mr. Chappell's trades and trading plans.  The Indictment first describes Mr. Chappell's June 2 trades—which were specifically approved by Humanigen's compliance department during an open trading window—without mentioning that approval.  Ind. ¶ 5(l).  The Indictment then

14

draws a contrast by noting that Mr. Chappell's proposed no-cost collar transaction, which ultimately was not executed, was approved by the board of directors. Ind. ¶ 5(m). But the Indictment then draws another contrast when it describes Mr. Chappell's subsequent trading plans as if they had not been approved by anyone (Ind. ¶ 5(o)), even though the prosecutors knew they had been approved by the Compliance Officer, the CEO, and the board. *See* Section I.A.2, *supra*. The effect of calling out the approval for trades that were *not* made while omitting reference to approval for the trades that *were* made gives the false impression that the latter trades were not approved. This provides further evidence that the prosecutors misled the grand jury regarding the issue of good faith.

What is more, prosecutors recently resisted this good faith instruction in a very similar case. In *United States v. Peizer*, the defendant had also traded pursuant to a Rule 10b5-1 plan after obtaining all relevant compliance approvals. No. 23-CR-89 (DSF) (C.D. Cal.). The government nonetheless vigorously opposed a jury instruction regarding the relevance of a compliance officer's advice to the issue of good faith, *Peizer*, Dkt. 238 at 64, and ultimately obtained a conviction. The President later cited that very overreach in pardoning the defendant. *See* Kenneth P. Vogel & Susanne Craig, *Trump Administration Updates: Government Delays Forced Collections of Student Loans*, N.Y. Times (Jan. 16, 2026) (describing White House official's statement that *Peizer* was "an example of excessive prosecution" in which the defendant "had properly disclosed the trades"). At least one of the same prosecutors representing the DOJ in this case also handled the *Peizer* matter. These actions in a similar, recent case yield yet another reason to believe the grand jury was misled here.

In light of the foregoing, we asked the prosecutors to disclose the legal instructions that were given on these two issues, and they declined to do so.

15

### B.      Applicable Law

#### 1.      The Government Must Prove "Use" of MNPI[9]

To prove insider trading, the government must establish that Mr. Chappell sold securities "on the basis of material, nonpublic information." *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997). The clear weight of authority holds that "on the basis of" requires a showing of "use" of the information. That is, "the government may not rest upon a demonstration that the suspected inside trader bought or sold while in possession of inside information; rather, it must, at a minimum, prove that the suspect used the information in formulating or consummating his trade." *United States v. Anderson*, 533 F.3d 623, 630 (8th Cir. 2008); *see also United States v. Smith*, 155 F.3d 1051, 1066-68 (9th Cir. 1998) (adopting "use" requirement and rejecting DOJ position that mere knowing possession is sufficient); *SEC v. Adler*, 137 F.3d 1325, 1337-39 (11th Cir. 1998) (adopting "use" requirement and rejecting SEC position that mere knowing possession is sufficient).

Applying the "use" standard, courts typically instruct juries that the government must prove that the defendant traded "because of" the MNPI and that "[i]t is not sufficient that the government proves that the defendant sold . . . stock while knowingly in possession of the material nonpublic information." *Smith*, 155 F.3d at 1066. This approach makes sense, because the statute requires intent to defraud, and "an investor who has a preexisting plan to trade, and who carries through with that plan after coming into possession of material nonpublic information, does not intend to defraud or deceive; he simply intends to implement his pre-possession financial strategy." *Id.* at 1068; *see also Adler*, 137 F.3d at 1333 (noting that relevant statutes "focus on fraud, deception, and manipulation").

---

[9] Unless otherwise noted, internal citations, quotations and alterations are omitted.

16

To adopt the contrary argument—that mere knowing possession is sufficient—would "go a long way toward making insider trading a strict liability crime."  *Smith*, 155 F.3d at 1068 n.25; *cf. Staples v. United States*, 511 U.S. 600, 606 (1994) (criminal offenses requiring no *mens rea* are "disfavored").  Furthermore, the requirement of "use" is consistent with the language used by the Supreme Court in insider trading cases for decades.  *See, e.g.*, *Salman v. United States*, 580 U.S. 39, 41 (2016) (noting that insider trading laws prohibit "using" inside information for personal advantage); *see also Smith*, 155 F.3d at 1067 (collecting similar Supreme Court citations).

The SEC and DOJ have sometimes—though not always—argued that mere knowing possession is sufficient.  But only one Circuit has embraced that argument and there is reason to doubt it is good law.  In *United States v. Teicher*, the Second Circuit favored the knowing possession standard for the sake of "simplicity" and because it thought (wrongly)[10] that this position was "consistently endorsed by the SEC."  987 F.2d 112, 120 (2d Cir. 1993).  But that aspect of *Teicher* was dicta.  *Id.* at 121 (stating it was "unnecessary to determine" the question); *see also Adler*, 137 F.3d at 1335 (describing that portion of *Teicher* as "clearly dicta").  And while a later panel purported to convert it to a holding, that decision was based in substantial part on *Chevron* deference.  *See United States v. Royer*, 549 F.3d 886, 899 (2d Cir. 2008) (citing *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984)).  *Chevron* is no longer good law.  *Loper Bright Enter. v. Raimondo*, 603 U.S. 369 (2024); *see also Whitman v. United States*, 574 U.S. 1003 (2014) (Scalia, J., criticizing Second Circuit for *Royer*'s use of

---

[10] The SEC's position has "undergone some fluctuation over time" and previously included a requirement that the MNPI "be a factor in the insider's decision to effect the transaction."  *Adler*, 137 F.3d at 1336 (quoting *In re Investors Management Company, Inc.*, Fed. Sec. L. Rep. (CCH) ¶ 78,163, at 80,514 (SEC Ruling July 29, 1971)).

17

*Chevron* deference to inform the scope of criminal liability)). Moreover, that portion of *Royer* was dicta as well, since the instructions given by the district court required that "the information in some way informed the investment decision," which the Second Circuit acknowledged was "more . . . than would be demanded under a knowing possession standard." *Royer*, 549 F.3d at 899 n.12.

Thus, notwithstanding the dicta in *Teicher* and *Royer*, even prosecutors in the Second Circuit routinely request that district courts instruct the jury consistent with versions of the "use" standard. *See, e.g.*, *United States v. Whitman*, 555 F. App'x 98, 107 (2d Cir. 2014) (information must be "at least a factor" in trading decision); *United States v. Lavidas*, 19-CR-716 (DLC) (S.D.N.Y.), Dkt. 48 at 12 ("[Y]ou may conclude that a trade was made 'on the basis of the inside information' if the information was a factor in the trading decision."); *United States v. Blakstad*, 19-CR-486 (ER) (S.D.N.Y.), Dkt. 92 at 13 (same instruction requested); *United States v. Rajaratnam*, 13-CR-211 (NRB) (S.D.N.Y.), Dkt. 73 at 35 ("A person uses material, nonpublic information in connection with a stock purchase or sale if that information is a factor in his decision to buy or sell the stock.").

The Third Circuit has not opined on this issue. One court in this Circuit adopted the "use" standard by instructing the jury that it must find that the information was a "significant factor in the defendant's decision" to trade and then granting in part defendant's motion for acquittal because it viewed the trial evidence was insufficient to meet that standard. *United States v. Heron*, 525 F. Supp. 2d 729, 748, 753 (E.D. Pa. 2007). On appeal, the government noted the disputed legal issue but argued that the Third Circuit need not reach it, *see* Gov't Brief, 2008 WL 5551064, at n.22, and so the Third Circuit did not reach the issue, instead reversing the

18

district court's decision based on its assessment of the evidence, *see United States v. Heron*, 323 F. App'x 150, 157 (3d Cir. 2009).

In sum, the government must prove that Mr. Chappell traded "on the basis of" MNPI, meaning that he "used" that information or traded "because of" it, not merely while in knowing possession of it.

### 2.      Intent to Defraud is Negated by Good Faith

The securities fraud statutes, which proscribe insider trading, each require that the defendant acted with "intent to defraud." *See, e.g.*, *United States v. Harra*, 985 F.3d 196, 222 & n.21 (3d Cir. 2021); *United States v. Parker*, 776 F. App'x 756, 760 & n.3 (3d Cir. 2019). An argument that the defendant relied on professional advice or the involvement of counsel is not an affirmative defense. *See, e.g.*, *United States v. Greenspan*, 923 F.3d 138, 146 (3d Cir. 2019) (advice of counsel); *Howard v. SEC*, 376 F.3d 1136, 1147 (D.C. Cir. 2004) (involvement of counsel). Rather, it is an argument that the defendant acted in good faith, which "negates the mental state required for the crime." *Greenspan*, 923 F.3d at 146. Put differently, evidence that a defendant relied on professional advice, if believed, "can raise a reasonable doubt in the minds of the jurors about whether the government has proved the required element of the offense that the defendant had an unlawful intent." *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017). Yet courts and prosecutors often wrongly shift the burden of proof to the defendant in this regard. *See, e.g.*, *id.* at 476-66; *Greenspan*, 923 F.3d at 147.

Just as with attorneys, courts have held that a defendant's reliance on trained professionals like securities compliance officers or accountants is also relevant to good faith and lack of unlawful intent. *See, e.g.*, *SEC v. Westport Capital Markets LLC*, 613 F. Supp. 3d 643, 646 (D. Conn. 2020) (compliance professionals); *United States v. Horner*, 853 F.3d 1201, 1210

19

(11th Cir. 2017) (accountants).  This is because "it would be formalist in the extreme to forbid a defendant from putting forward evidence that it had relied in good faith on persons it thought were experts in the law simply because those persons lacked law licenses."  *Westport Capital Markets*, 613 F. Supp. 3d at 646.

### 3.      Incorrect or Misleading Legal Instructions Require Dismissal

The grand jury is "so essential to basic liberties" that its role as "protector of citizens against arbitrary and oppressive governmental action" is enshrined in the Constitution.  *United States v. Calandra*, 414 U.S. 338, 342-43 (1974).  Before serious federal charges can be brought, "the Fifth Amendment require[s] that the grand jury find probable cause for each of the elements of a violation of [federal law]."  *United States v. Martinez*, 800 F.3d 1293, 1295 (11th Cir. 2015); *accord United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000).  Although the grand jury is an independent body, it relies heavily on the prosecutor, who "advises the lay jury on the applicable law."  *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 430 (1983).

While the prosecutors' instructions to the grand jury need not "approach the comprehensiveness of the trial judge's charge to the jury,"[11] the legal instructions may not be "misleading" and "an indictment will be dismissed where, for instance, the evidence clearly establishes a defense to the charge and the government fails to inform the grand jury of the legal requirements of the defense."  *United States v. Twersky*, 1994 WL 319367, at *4 (S.D.N.Y. June

---

[11] Some courts (though not the Third Circuit) have found that the government may simply read the statute to the grand jury, rather than providing legal instructions.  *See, e.g.*, *United States v. Lopez-Lopez*, 282 F.3d 1, 9 (1st Cir. 2002).  Even if that may be true in some cases, which is dubious, it cannot be true in the context of insider trading, where the elements of the crime are not mentioned in the statutory text but rather are the product of decades of judge-made law.  In any event, it is well settled that if prosecutors give legal instructions, they cannot be misleading: "the issue at hand is not whether the Government wrongly failed to give any instruction, but rather, whether it gave instructions which were erroneous."  *Twersky*, 1994 WL 319367, at *5 n.1.

29, 1994).  Put differently, where a prosecutor misstates the applicable law, the indictment will be dismissed if "there is grave doubt that the decision to indict was free from [the] substantial influence" of the erroneous instruction.  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263 (1988); *see United States v. Peralta*, 763 F. Supp. 14, 21 (S.D.N.Y. 1991) (applying *Bank of Nova Scotia* standard to erroneous grand jury instructions).

Thus, courts have often dismissed indictments based on prejudicial errors in the prosecutors' legal instructions to the grand jury.  *See, e.g.*, *United States v. D'Alessio*, 822 F. Supp. 1134, 1135-36, 1145-46 (D.N.J. 1993) (dismissing indictment where prosecutors gave erroneous legal instruction about public official's duty); *United States v. Stevens*, 771 F. Supp. 2d 556, 564-68 (D. Md. 2011) (dismissing indictment where prosecutors gave erroneous instructions regarding good faith evidence that negated intent); *United States v. Cerullo*, 2007 WL 2462111, at *3-4 (S.D. Cal. Aug. 28, 2007) (dismissing indictment where prosecutors misled grand jury about intent requirement); *United States v. Bowling*, 108 F. Supp. 3d 343, 352-53 (E.D.N.C. 2015) (dismissing counts where prosecutors gave erroneous legal instruction about what type of information could not be disclosed under procurement statute); *Peralta*, 763 F. Supp. at 20 (dismissing indictment where prosecutor gave misleading instruction regarding constructive possession).

### 4.    Courts Regularly Inspect Grand Jury Minutes

The court may authorize disclosure of grand jury materials where the defendant "shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."  Fed. R. Crim. P. 6(e)(3)(E)(ii).  Typically, a defendant seeking grand jury transcripts "must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that

their request is structured to cover only material so needed." *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979). But "as the considerations justifying secrecy become less relevant, a party asserting a need for grand jury transcripts will have a lesser burden." *Id.* at 223.

Courts thus often order disclosure or *in camera* inspection of grand jury transcripts where there is a non-speculative basis to believe that the prosecutors gave misleading legal instructions. *See, e.g.*, *United States v. FedEx Corp.*, 2016 U.S. Dist. LEXIS 6155, at *13-15 (N.D. Cal. Jan. 19, 2016) (ordering disclosure to defense given unique nature of prosecution and prosecutors' actions in another case); *Twersky*, 1994 WL 319367, at *5 (ordering *in camera* inspection, noting that "once an investigation is over, most of the policies which warrant maintaining the secrecy of the grand jury proceeding . . . are no longer present"); *United States v. Ceneus*, 2011 WL 5547107, at *2 (N.D. Fl. 2011) (ordering *in camera* inspection where "language of the indictment in this case suggests that [prosecutor] improperly instructed the grand jury"); *United States v. Ho*, 2009 WL 2591345, at *3-5 (D. Haw. 2009) (ordering *in camera* inspection where prosecutor's statements at hearing suggested a misunderstanding of legal standard); *United States v. Bravo-Fernandez*, 239 F. Supp. 3d 411, 415-16 (D. P.R. 2017) (ordering *in camera* inspection given change in legal standard).

### C.     Discussion

The Court should order disclosure or *in camera* inspection of the grand jury minutes. Each of the *Douglas Oil* factors is clearly met here.

### 1.     Disclosure is Needed to Avoid a Possible Injustice

Disclosure is needed to avoid a possible injustice, as there is compelling evidence that the prosecutors obtained an indictment based on erroneous or misleading legal instructions. This is true in two respects.

22

*First*, to prove insider trading, prosecutors must show that the defendant "used" material non-public information, not merely that he possessed it. *See* Section I.B.1, *supra*. But there is compelling evidence that the prosecutors in fact instructed the grand jury based on a "mere possession" standard: The Indictment quotes a company policy manual that states that erroneous standard; the Indictment does not allege "use" of MNPI but makes repeated reference to "possession"; and the government repeatedly misstated the legal standard in search warrant applications. *See* Section I.A.4, *supra*. These facts clearly warrant disclosure of the grand jury minutes. *See, e.g.*, *FedEx Corp.*, 2016 U.S. Dist. LEXIS 6155, at *5-6, 14 (ordering disclosure where language in indictment indicated that government misunderstood the law).

If the government misled the grand jury in this manner, it would lead to dismissal, as a case from this District illustrates. In *D'Alessio*, the defendant, a county sheriff running for county executive, allegedly sold tickets to a fundraiser without disclosing that the funds would be used for his personal benefit rather than for his campaign. 822 F. Supp. at 1136-37. The indictment charging him with fraud cited a rule that purported to prohibit the defendant, as county sheriff, from soliciting and receiving personal gifts. *Id.* at 1138. But the court was doubtful this rule even applied under the circumstances, making it an inappropriate basis for criminal charges. *Id.* at 1135, 1144. While the government had pressed two theories of fraud, only one of which involved the inapplicable rule, the court held it would not "speculate as to what the grand jury would have done" if the grand jury had not been advised of the inapplicable rule. *Id.* at 1145. Instead, the court held that there was a "distinct and reasonable possibility that the inclusion of [the inappropriate instruction] infected both prongs" of the charged scheme; the court therefore dismissed the relevant counts in their entirety. *Id.* at 1146.

23

Here, the Indictment also cited an inapplicable rule (Humanigen's company policy) on a key issue and doubled down on that error by repeatedly invoking possession rather than use. That erroneous standard would dramatically lower the government's burden of proving causation to something approaching strict liability. *See Smith*, 155 F.3d at 1068 n.25. There is thus a "reasonable possibility" that the prosecutors' citation of the wrong standard "infected" the grand jury's deliberations. *D'Alessio*, 822 F. Supp. at 1146. And the error is especially prejudicial where, as here, there is clear evidence that Mr. Chappell had preexisting plans to sell 25% of his Humanigen stock, showing that he did not "use" any alleged MNPI he received after making those plans. *See* Section I.A.1, *supra*. Given that apparent defense, there is grave doubt that a properly instructed grand jury would have returned an indictment. *See, e.g., Twersky*, 1994 WL 319367, at *4 ("an indictment will be dismissed where . . . the evidence clearly establishes a defense to the charge and the government fails to inform the grand jury of the legal requirements of the defense").

*Second*, the charged crimes require an intent to defraud, which is negated by good faith reliance on the advice of professionals. *See* Section I.B.2, *supra*. Once again, there is compelling evidence that the prosecutors misled the grand jury on this element: The Indictment does not specifically allege intent to defraud or lack of good faith; the Indictment is deliberately phrased to suggest that Mr. Chappell did not receive compliance approvals for the relevant trades, when in fact he did; and the same prosecutor vigorously opposed this instruction in a recent, similar case, leading to a pardon based on prosecutorial overreach. *See* Section I.A.4, *supra*. These facts also warrant disclosure of the grand jury minutes. *See FedEx Corp.*, 2016 U.S. Dist. LEXIS 6155, at *7, 14 (ordering disclosure based on indictment's language and government's erroneous instruction in similar case).

If the government made that same error here, it would lead to dismissal, as *United States v. Stevens* illustrates. In that case, an in-house lawyer was charged with making false statements in response to an FDA inquiry. 771 F. Supp. 2d at 559. In response to a defense motion, the court inspected the grand jury minutes and found that the prosecutors had given a misleading instruction regarding advice of counsel, effectively telling the grand jury it was an affirmative defense that could be ignored at the probable cause stage, rather than explaining that it was relevant to the question of good faith. *Id.* at 564-67. That instruction addressed the "elephant in the room," given the defendant's role in a team of lawyers responding to the inquiry. *Id.* at 568. As a result, the court had "grave doubts as to whether the decision to indict was free from the substantial influence of the improper advice of counsel instruction" and therefore dismissed the indictment. *Id.*

Here, too, good faith is the "elephant in the room." There is overwhelming evidence that Mr. Chappell did what any responsible corporate executive should do. He and his colleagues discussed the legal implications of the FDA feedback at a board meeting with Outside Counsel and compliance. The company made the public disclosures that Outside Counsel, compliance, and the board's audit and disclosure committees believed were appropriate. Then, during an open trading window, Mr. Chappell consulted with compliance, the board, and Outside Counsel, and received all necessary approvals to make his long-planned trades. Yet, instead of explaining any of this to the grand jury, it appears the prosecutors presented a misleading version in which Mr. Chappell received approval ***only*** for the no-cost collar transaction he never executed, but not for the trades he did execute. Just as in *Stevens*, there is compelling evidence that they misled the grand jury.

In sum, the prosecutors likely misled the grand jury on two key legal issues, either one of which would be grounds to dismiss the Indictment.  Disclosure of the grand jury minutes is therefore needed to avoid a possible injustice.

### 2.    The Need For Disclosure Is Greater Than the Need for Secrecy

The presumption of grand jury secrecy arises from concerns about encouraging witnesses to come forward and testify frankly, about defendants fleeing or tampering with witnesses, and about ensuring that those who are investigated but exonerated by the grand jury are not held up for public ridicule.  *Douglas Oil*, 441 U.S. at 219.  These concerns are "reduced" when a grand jury has ended its activities, such that "a party asserting a need for grand jury transcripts will have a lesser burden."  *Id.* at 223; *see also Twersky*, 1994 WL 319367, at *5 ("[O]nce an investigation is over, most of the policies which warrant maintaining the secrecy of the grand jury proceeding, including, preventing the escape of those not yet indicted, are no longer present.").

The need for grand jury secrecy is minimal here.  Mr. Chappell has been indicted and arrested, so there is no concern that disclosure of the investigation would cause flight (and there is no indication that the grand jury is investigating others who might flee).  There can be no credible allegation that Mr. Chappell might tamper with witnesses, particularly given that the prosecutors have disclosed hundreds of pages of witness statements with no such consequence.  And to the extent the government has a generic concern about chilling witness testimony in future grand juries, such concern simply is not implicated by disclosure of the instructions given to the grand jury.  *See United States v. Facteau*, 2016 WL 4445741, at *4 (D. Mass. 2016).[12]

---

[12] Indeed, though it is a minority view, some courts have held that that a particularized need is not even required to order disclosure of legal instructions given to the grand jury, since "[t]he instructions do not reveal the substance of the grand jury's deliberative process or other

26

As set forth above, there is strong evidence that the prosecutors misled the grand jury. There is no legitimate interest in keeping that misconduct a secret, and certainly none that outweighs the need for disclosure.

### 3.    The Request is Appropriately Limited

Finally, Mr. Chappell's request is appropriately modest in scope. The above-described evidence is sufficient to warrant disclosure to the defense of at least the instructions given to the grand jury, and also any colloquy relevant to the two key issues discussed above. *See, e.g.,* *Stevens*, 771 F. Supp. 2d at 564 (ordering disclosure of excerpt relevant to advice of counsel issue). But, in the alternative, the Court may take a more limited approach by first inspecting the transcript *in camera* to review whether further disclosure is warranted. Courts often use this stepwise procedure to assess challenges to the accuracy of the grand jury instructions. *See, e.g.,* *United States v. Comey*, 809 F. Supp. 3d 396, 409, 413 (E.D. Va. 2025) (reviewing grand jury materials *in camera* and then ordering disclosure to defense after finding, *inter alia*, that prosecutors made what appear to be "fundamental misstatements of the law"); *Bravo-Fernandez*, 239 F. Supp. 3d at 415-16; *FedEx Corp.*, 2016 U.S. Dist. LEXIS 6155, at *14-15; *Ceneus*, 2011 WL 5547107, at *2; *Ho*, 2009 WL 2591345, at *3-5. *In camera* review by the Court presents none of the secrecy concerns posited above, but would allow the Court to evaluate whether there was in fact an error in the grand jury proceedings and then order further disclosure and/or briefing as may be appropriate.

Accordingly, the Court should order disclosure or *in camera* inspection of the grand jury minutes.

---

information that would compromise the secrecy that Rule 6 seeks to protect." *United States v. Belton*, 2015 WL 1815273, at *3 (N.D. Cal. Apr. 21, 2015) (collecting cases).

## II.    The Court Should Order the Government to Provide a Bill of Particulars

Mr. Chappell has a constitutional right to adequate notice of the specific charges against him.  The government has failed to provide it.  The Indictment does not specify the MNPI that Mr. Chappell is alleged to have used, and the government has declined the defense's request for further details.  Worse, there is evidence that the government's failure to specify this information is tactical, as the prosecutors have already once revised their prosecution theory to attempt to plead around some of the compelling exculpatory evidence described above.  The Court should thus order the government to provide a bill of particulars, so that Mr. Chappell can adequately prepare his defense and avoid unfair surprise at trial.

### A.    Applicable Law

The Constitution guarantees every criminal defendant the right to notice of the accusations to which he must answer.  U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation.").  Thus, "real notice of the true nature of the charge against" the defendant is "the first and most universally recognized requirement of due process."  *Smith v. O'Grady*, 312 U.S. 329, 334 (1941).

For these reasons, Federal Rule of Criminal Procedure 7(f) entitles a defendant to a bill of particulars where an indictment fails to adequately set forth the charges.  *United States v. Roque*, 2013 WL 2474686, at *6 (D.N.J. June 6, 2013).  A bill of particulars serves "to inform the defendant of the nature of the charges brought against him, to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense."  *United States v. Urban*, 404 F.3d 754, 771 (3d Cir. 2005).

28

Whether to grant a bill of particulars involves a fact-specific inquiry that rests within the discretion of the district court. *United States v. Addonizio*, 451 F.2d 49, 64 (3d Cir. 1971). A court should grant a motion seeking a bill of particulars "whenever an indictment's failure to provide factual or legal information significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial." *United States v. Rosa*, 891 F.2d 1063, 1066 (3d Cir. 1989); *United States v. DePaoli*, 41 F. App'x 543, 546 (3d Cir. 2002). "[T]he class of cases in which a bill of particulars should, or may, be granted is broader than the class of cases in which it must be granted." *Roque*, 2013 WL 2474686, at *6-7.

In insider trading cases, courts frequently order the government to specify the alleged MNPI used. *See, e.g.*, *United States v. Rajaratnam*, 2010 WL 2788168, at *3-4 (S.D.N.Y. July 13, 2010) (granting request that the government disclose "specifics about . . . the content of the inside information and the dates on which it was exchanged"); *United States v. Contorinis*, 2010 U.S. Dist. LEXIS 74739, at *1 (S.D.N.Y. May 5, 2010) (requiring that "the government . . . submit a bill of particulars with respect to the material, non-public information allegedly disclosed"); *United States v. Falbo*, 1993 WL 147441, at *1 (S.D.N.Y. Apr. 6, 1993) (granting motion for a bill of particulars "as to the material nonpublic information the government will contend that defendant(s) learned"); *United States v. Nacchio*, 2006 WL 2475282, at *5-9 (D. Colo. Aug. 25, 2006) (directing the government to provide additional particulars regarding the nature of the inside information). The need for particulars is particularly acute in insider trading cases because the merits of an insider trading charge "depend heavily on the facts and context." *Rajaratnam*, 2010 WL 2788168, at *2 (collecting cases).

**B.    Discussion**

**1.    Neither the Indictment Nor Discovery Specify the MNPI At Issue**

When presented with a motion for a bill of particulars, courts examine whether the information the defendant seeks is included in the indictment or discovery produced by the government.  *See United States v. Ligambi*, 2012 WL 2362638, at \*4 (E.D. Pa. June 21, 2012).  Here, neither the Indictment nor the discovery materials produced to the defense specify the MNPI that Mr. Chappell is alleged to have used.

The Indictment broadly alleges that, from January to August 2021, Mr. Chappell "used his position at [Humanigen] to engage in a securities fraud scheme that enabled him to sell Humanigen securities based on material non-public information."  Ind. ¶ 1.  However, the Indictment does not specify what that MNPI was.  The closest the Indictment comes is under the heading "Manner and Means of the Scheme to Defraud," in which the Indictment lists four instances in which information was allegedly communicated to Mr. Chappell by the FDA:

(1)    "On or about January 14, 2021, the FDA told Humanigen that it 'do[es] not agree with changing the primary endpoint'" of Lenz's clinical trial after Humanigen had made that change.  Ind. ¶ 5(a).

(2)    "On or about April 12, 2021, the FDA sent preliminary comments to Humanigen about the Clinical Trial" including the comment that "'the criteria for issuance of an EUA are unlikely to be met based on results' from the Clinical Trial."  Ind. ¶ 5(d).

(3)    During an April 14, 2021 meeting between the FDA and Humanigen, "the FDA repeated that '[w]hile available data for your product are promising, the criteria for issuance of an EUA are unlikely to be met based on results' from the Clinical Trial" and "'discouraged submission of an EUA at this time.'"  Ind. ¶ 5(e).

(4)    "On or about May 13, 2021, the FDA shared written minutes of its April 14, 2021 meeting," which added post-meeting comments that "'reiterate[d the FDA's] concerns conveyed during the meeting on April 14, 2021.'"  Ind. ¶ 5(h).

However, at no point does the Indictment specify whether any of these alleged communications, or any other communications, are MNPI.  If the government thinks one or all of those communications constitute MNPI, it should specifically say so in the Indictment or a bill of particulars.  But without such clarity, the defense is left guessing.

The government is wrong in claiming that the voluminous discovery it has already provided in this case obviates the need for a bill of particulars.  *See* McKay Decl., ¶ 47, Ex. 45 at 1-2.  To date, the government has produced more than 1.2 million pages of discovery, but none of those pages specify the MNPI that Mr. Chappell is alleged to have used.  "[D]isclosure by the government of mountains of documents is not an adequate substitute for a bill of particulars when the government's disclosure does not provide guidance regarding what it seeks to prove at trial."  *United States v. Lacerda*, 2013 WL 3146835, at *14 (D.N.J. June 19, 2013).  Indeed, voluminous production of documents by the government, without specification of which documents contain alleged MNPI, only tends to aggravate the lack of notice and difficulties of trial preparation, and therefore weighs in favor of granting a bill of particulars.  *See United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000) ("[T]he large volume of material disclosed is precisely what necessitates a bill of particulars").  That is particularly so in insider trading cases, where courts have found that exhaustive discovery productions by the government do not weigh against a grant of particulars.  *See Nacchio,* 2006 WL 2475282, at *7 (finding that it was "not sufficient simply to refer defense counsel to discovery," because "dumping vast quantities of documents and information on one's opposing party does not always elucidate what is going on, so that the defendant can adequately prepare for trial"); *Lacerda*, 2013 WL 3146835, at *14.

31

### 2.    A Bill of Particulars is Necessary to Prevent Unfair Surprise

The government has already shifted its theory in light of certain exculpatory information, demonstrating exactly how a bill of particulars is required to prevent unfair surprise.

Prior to the Indictment, the SEC brought an enforcement action against Mr. Chappell, and the DOJ conducted a lengthy parallel grand jury investigation.  The SEC's complaint, filed nearly a year before the Indictment, focused entirely on the information allegedly shared with Mr. Chappell by the FDA in April and May 2021 (described in Indictment ¶¶ 5(d), (e) and (h) and in paragraphs (2), (3) and (4) above).  *See SEC v. Chappell, et al.*, No. 23-CV-3769 (D.N.J.), ECF 1, ¶¶ 32-34, 37.  The complaint made no mention whatsoever of the January 2021 communication from the FDA listed in Indictment ¶ 5(a) and paragraph (1) above.

Similarly, during the DOJ's grand jury investigation and prior to the unsealing of the SEC complaint, the government obtained numerous search warrants.  The affidavits in support of those warrants set out in detail the evidence the government believed established probable cause.  Again, the DOJ focused entirely on the April and May 2021 communications.  The affidavits made no mention whatsoever of the January 2021 communication.  *See, e.g.*, McKay Decl., ¶ 46, Ex. 44 at 24-26.

Shortly after the SEC complaint was filed, Mr. Chappell provided both the SEC and the DOJ with some, though not all,[13] of the evidence described in Section I.A.1, *supra*, establishing Mr. Chappell's clear, pre-existing plans to sell his Humanigen stock.  The evidence provided at that time included the fact that Mr. Chappell had phone calls with investors in his funds on February 12, 2021 and March 13, 2021, during which he communicated his intention to sell a

---

[13] Notably, the defense did not, at that time, describe the December 19, 2020 conversation with the Investor.  The defense did not yet have the Investor's notes memorializing Mr. Chappell's statements.

portion of his Humanigen stock, *see* McKay Decl., ¶ 15, Ex. 13, ¶ 5; ¶ 12, Ex. 10 at 1, and that

Mr. Chappell emailed a broker on March 16, 2021 that "We are only selling up to 9% of our

HGEN stock with the current 10b-5 plan ***so there is a lot more to come***," *see* McKay Decl., ¶ 17,

Ex. 15 (emphasis added).  This exculpatory evidence demonstrated Mr. Chappell's plans to trade

*before* the April and May 2021 communications that had been the focus of the SEC complaint

and the DOJ's investigation.

That should have given the DOJ pause about bringing criminal charges.  Instead, the DOJ

shifted and expanded its theory.  The Indictment is the first document to make any mention of

the January 14, 2021 communication, when the FDA allegedly disagreed with Humanigen

changing one of the trial's endpoints.  Ind. ¶ 5(a).  This addition was clearly designed to plead

around the clear evidence from February and March 2021 of Mr. Chappell's preexisting plans to

trade.

To be clear, the government's attempts to shift the goalposts are futile:  As discussed

above, though the DOJ may not have appreciated it at the time it sought the Indictment, Mr.

Chappell's pre-existing plans to trade pre-dated even that January 2021 communication.  *See*

Section I.A.1, *supra*.  Moreover, the January 2021 communication from the FDA is plainly not

material, as the FDA was merely expressing disagreement with one aspect of the study design,

not communicating a preemptive denial of Humanigen's EUA application, as would be required

for such a preliminary communication to be material.  *See SEC v. Chappell*, 107 F.4th 114, 132

(3d Cir. 2024) (FDA statement material if it is "more like an advance notice of [the

application's] certain rejection").

But this clear example of goalpost-shifting illustrates the notice problem that requires a

bill of particulars here.  Given the Indictment's failure to specify the alleged MNPI that was

used, the government may attempt to shift the goalposts again in light of further exculpatory information, to gin up new allegations of alleged MNPI that Mr. Chappell received at other points in time. If that were to occur at or close to trial, it would be exactly the sort of trial-by-surprise that the Constitution's notice requirement is designed to prevent. Absent a bill of particulars, Mr. Chappell's defense will be forced to play a version of "whack a mole" in which it guesses which specific communications it will have to deal with at trial, only to have the government argue that different communications, for which the defense has not prepared, were MNPI.

This concern for fundamental fairness often prompts courts to order bills of particulars in insider trading cases. For example, in *United States v. Rajaratnam*, the district court ordered the government to provide a bill of particulars specifying the content of the inside information that defendants were alleged to have used and the dates on which it was exchanged. 2010 WL 2788168, at *4-5. In doing so, the court reasoned that "[a] defendant might argue that the information he sought to obtain was not material, or that it was already public at the time he tried to get it. But he can only do that if he knows what the information *is* and when it was conveyed." *Id*. at *1 (emphasis in original).

Here, as in *Rajaratnam*, the government has failed to identify the critical component of the charged crimes—the MNPI—and without this information Mr. Chappell is left to guess as to what information he is alleged to have used in deciding to sell his Funds' shares. Accordingly, a bill of particulars is warranted.

34

### III.    Counts Three, Four, and Five Are Multiplicitous and the Court Should Dismiss or Consolidate Them

Counts Three, Four, and Five of the Indictment charge Mr. Chappell with insider trading under 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5, based on stock sales that occurred on June 16, 2021, June 25, 2021, and July 23, 2021.  Ind. at 15.  These three counts are multiplicitous because each was the result of the same act—Mr. Chappell's execution of Rule 10b5-1 trading plans on June 15, 2021—and must be dismissed or consolidated into a single count.

#### A.    Applicable Law

"An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999).  "This violates the Double Jeopardy Clause of the Fifth Amendment, subjecting a person to punishment for the same crime more than once." *Id.*  When an indictment charges a defendant with multiplicitous counts, "two vices may arise. First, the defendant may receive multiple sentences for the same offense.  Second, a multiplicitous indictment may improperly prejudice a jury by suggesting that a defendant has committed several crimes—not one." *United States v. Langford*, 946 F.2d 798, 802 (11th Cir. 1991).

"When a defendant is charged twice for the same statutory violation, the question is whether Congress intended the facts underlying each count to make up a separate unit of prosecution.  The unit of prosecution is the aspect of criminal activity that Congress intended to punish." *United States v. Sandstrom*, 594 F.3d 634, 637 (8th Cir. 2010).  "[Courts] look to the statutory language, legislative history, and statutory scheme to ascertain what Congress intended the unit of prosecution to be.  When Congress fails to establish the unit of prosecution clearly

35

and without ambiguity, [courts] resolve doubt as to congressional intent in favor of lenity for the defendant." *Id.* at 652.

In securities fraud prosecutions, the Eleventh Circuit has held that "[t]he allowable unit of prosecution under section 78j(b) is . . . the use of a manipulative device or contrivance," although this need not be "the complete scheme to defraud; rather, it can be any false statement of material fact in connection with a discrete purchase or sale of a security." *Langford*, 946 F.2d at 803. In *Langford*, the Eleventh Circuit rejected the government's contention "that each and every use of the mails under a scheme to defraud is a separate offense" under Section 78j(b), dismissing it as a misreading of the securities fraud statute and concluding instead that "several mailings (or other instrumentalities of interstate commerce), all based on a single transaction" could not "be charged in multiple counts." *Id.* at 803-04.

In *United States v. Haddy*, 134 F.3d 542 (3d Cir. 1998), the Third Circuit similarly held in a securities fraud case that the appropriate unit of prosecution was the fraudulent scheme itself, not the individual transactions or sales. The court emphasized that the relevant statutes— including 15 U.S.C. § 78j(b) and Rule 10b-5—proscribe the use of fraud or deceptive devices "in connection with the purchase or sale" of a security, and concluded that "the individual purchase or sale of securities" was not the appropriate unit of prosecution in that case. *Id.* at 548-49. In doing so, the Third Circuit cited *Langford* approvingly. *Id*. at 549.

### B.    Discussion

Here, the Indictment alleges that on June 15, 2021, Mr. Chappell executed Rule 10b5-1 trading plans for each of the Black Horse Funds,[14] and provided those plans to his broker. Ind.

---

[14] While there are three plans – one for each of the Black Horse Funds – the Indictment does *not* differentiate between sales made under one plan or the other. Indeed, on each of the three dates cited in Counts Three, Four and Five, sales were made for each of the three Funds under each of

36

¶ 5(o).  Those plans set the terms under which shares would be sold—specifically, a triggering price of $17 for approximately 3,360,000 Humanigen shares—with sales to begin one day later, on June 16, 2021.  *Id*.  Humanigen shares were then sold "pursuant to the 10b5-1 plans, between in or around June 2021 and in or around August 2021."  *Id*.

Critically, the sales charged in Counts Three, Four, and Five were all made pursuant to the plans that Mr. Chappell executed on June 15, 2021.  Each of these sales occurred automatically and without any further action or decision-making by Mr. Chappell.  Once Mr. Chappell signed the 10b5-1 plans and transmitted them to his broker, the broker executed the trades mechanically according to the plans' predetermined terms; Mr. Chappell made no subsequent decisions to sell, gave no further instructions, and exercised no discretion over the timing or execution of the individual transactions.  And the Indictment specifies no allegedly false statements that Mr. Chappell made unique to any of these sales.

Applying the reasoning in *Haddy* and *Langford*, the proper unit of prosecution—the alleged "manipulative device or contrivance"—was Mr. Chappell's entry into the Rule 10b5-1 trading plans on June 15, 2021 while representing he did not possess MNPI, not the subsequent trades executed automatically by his broker.  *Langford* holds that "each count of the indictment must be based on a separate purchase or sale of securities ***and*** each count must specify a false statement of material fact . . . in connection with that purchase or sale."  946 F.2d at 804 (emphasis added).  Counts Three, Four and Five meet the former requirement, but not the latter.  After Mr. Chappell executed the June 15 plans, each trade made pursuant to those plans involved no new alleged false statement by Mr. Chappell and no additional exercise of discretion or

---

the three plans.  The three different counts are tied to the three different dates, not the three different plans.

judgment.  Mr. Chappell's broker simply executed trades according to predetermined terms set forth in the plans.  Under these facts, allowing the government to charge each individual trade as a separate offense would permit prosecutors to multiply charges based on factors entirely outside a defendant's control, such as market conditions, trading volume, and the broker's independent execution decisions.  These are the "vices of multiplicity" that *Langford*'s holding prevents.  *Id.*; *see also Haddy*, 134 F.3d at 549 (citing *Langford* approvingly and noting that it "does not mandate that each sale *must* form the basis of a count" but rather that "any false statement in connection with a discrete sale can be considered an appropriate unit of prosecution" (emphasis in original)).

Allowing the government to proceed on three separate counts for what is, at most, a single offense would expose Mr. Chappell to multiple punishments for the same conduct, in violation of the Double Jeopardy Clause.  *See Chacko*, 169 F.3d at 145.  It would also create a substantial risk of prejudice at trial, as the jury may be misled into believing that Mr. Chappell engaged in three separate criminal acts when, in fact, only one decision—his decision to enter into the trading plans—is at issue.  *See Langford*, 946 F.2d at 802.

Accordingly, Counts Three, Four, and Five are multiplicitous and should be dismissed or, at minimum, consolidated into a single count.

38

## **CONCLUSION**

For the foregoing reasons, we respectfully request that the Court issue an order: (1) directing the government to disclose or order *in camera* inspection of the grand jury minutes; (2) directing the government to provide a bill of particulars; and (3) dismissing or consolidating Counts Three, Four, and Five as multiplicitous.

Dated: March 27, 2026
      New York, New York

<div style="margin-left:40%">

MORVILLO ABRAMOWITZ
GRAND IASON & ANELLO, P.C.

By: */s/ Thomas A. McKay*
    Jonathan S. Sack
    Thomas A. McKay
    Marisa A. Papenfuss

*Attorneys for Defendant Dale Chappell*

</div>